J-S06017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.R.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1352 WDA 2025 |

Appeal from the Order Dated September 18, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  57 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.D.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1353 WDA 2025 |

Appeal from the Order Dated September 18, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  56 of 2024

BEFORE:   KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED:  June 15, 2026**

A.M. ("Mother") appeals from the September 18, 2025, orders that involuntarily terminated her parental rights to her son, C.D.P., born in

---

[*] Former Justice specially assigned to the Superior Court.

December 2021, and daughter, D.R.P., born in November 2022 (collectively, "the Children").[1] Upon careful review, we affirm.

We gather the relevant factual and procedural history of this matter from the certified record. In February 2022, Parents and C.D.P. were residing in Cambria County, when Cambria County Children and Youth Services ("CYS") received a report that C.D.P., then three months old, had been hospitalized for multiple brain bleeds. *See* Orphans' Court Opinion, 9/18/25, at 3 (unpaginated).[2] Father, who was primarily responsible for taking care of C.D.P. while Mother was working outside of the home, claimed these injuries occurred when the family dog jumped on the infant. *See id*.; *see also* N.T., 10/31/24, at 13-14. The treating physician concluded, however, child abuse was the likely cause of C.D.P.'s severe injuries. *See* Orphans' Court Opinion, 9/18/25, at 3 (unpaginated); *see also* N.T., 3/20/25, at 195.

Following an investigation by CYS, the Cambria County Court of Common Pleas deemed Father to be a founded perpetrator of child abuse

---

[1] By the same orders, the Orphans' Court also involuntarily terminated the parental rights of the Children's father, C.A.P. ("Father") (collectively with Mother, "Parents"). Father did not file an appeal or participate in the instant appeal.

[2] Accompanying the orders involuntarily terminating Mother's parental rights, the Orphans' Court filed separate, largely identical, opinions for each child. Citations to "Orphans' Court Opinion" refer to the opinion accompanying the order involuntarily terminating Mother's parental rights to C.D.P.

against C.D.P. ***See*** N.T., 10/31/24, at 53-54; ***see also*** N.T., 3/20/25, at 149. Father was also criminally charged with injuring C.D.P.[3]

In March 2022, upon C.D.P.'s discharge from the hospital, CYS implemented a safety plan requiring that a maternal aunt supervise Parents' contact with C.D.P.[4] ***See*** Orphans' Court Opinion, 9/18/25, at 3-4 (unpaginated). On May 25, 2022, the Cambria County Court of Common Pleas adjudicated C.D.P. dependent and placed him with the same maternal aunt. ***See id***. at 4 (unpaginated); ***see also*** N.T., 3/20/25, at 118. In furtherance of the goal of reunification, the court ordered Mother to, *inter alia*: (1) submit to a psychological evaluation and follow all resulting recommendations; (2) participate in a parenting capacity evaluation and follow all recommendations; (3) engage in mental health treatment; and (4) attend visits with C.D.P.

Parents, who remained an intact couple following C.D.P.'s physical abuse, moved to Westmoreland County sometime between May 2022 and November 2022. Westmoreland County Children's Bureau ("WCCB") began managing Parents' court-ordered services in approximately November 2022. ***See*** Orphans' Court Opinion, 9/18/25, at 5 (unpaginated). That same month, WCCB learned that Mother had given birth to D.R.P. ***See id***. Upon D.R.P.'s

_____

[3] At the time of the termination proceedings, the charges against Father were still pending.

[4] The record is unclear whether the court placed C.D.P. in the maternal aunt's home.

- 3 -

discharge from the hospital, WCCB implemented a safety plan that required Parents' interactions with D.R.P. to be supervised by her maternal grandfather.[5]  *See* N.T., 10/31/24, at 91.

In December 2022, WCCB contracted with Richelle O'Malley, D.S.W. ("Dr. O'Malley") to conduct a comprehensive parenting capacity assessment of Parents.  *See id*. at 90-91.  Between January and February 2023, Dr. O'Malley individually interviewed Parents and observed Mother with the Children.  *See id*. at 92-97.  According to Dr. O'Malley, Mother never "consider[ed] the possibility that [C.D.P.'s injuries] could have been caused by Father."  *Id*. at 107.  Accordingly, Dr. O'Malley recommended Mother engage in mental health services, including a psychological evaluation and non-offender's domestic violence counseling ("non-offender's counseling").[6]  *See id*. at 107-108.  Dr. O'Malley further opined that D.R.P. should be removed from Parents' care to ensure her safety.  *See id.* at 108.

On February 15, 2023, Neil Rosenblum, Ph.D. ("Dr. Rosenblum"), conducted a psychological evaluation of Mother and diagnosed her with

---

[5] It is unclear from the certified record whether the court placed D.R.P. in the maternal grandfather's home at the time of her discharge from the hospital.

[6] According to Mikyla Tipton ("Ms. Tipton"), Mother's non-offender's counseling therapist, the purpose of this treatment is to "help the parent understand what child abuse and neglect may look like.  We also go over the long-term consequences that it can have on a child.  And we specifically focus on that parent's needs."  N.T., 2/10/25, at 59.

unspecified bipolar disorder, social anxiety disorder, unspecified trauma and stressor-related disorder, and borderline personality disorder. *See* N.T., 10/31/24, at 9, 21, 27-28. Dr. Rosenblum recommended Mother participate in intensive outpatient treatment, medication management, and non-offender's counseling. *See id*.

WCCB sought emergency protective custody of D.R.P., which the Westmoreland trial court granted. *See* N.T., 3/20/25, at 118. The court adjudicated D.R.P. dependent on March 31, 2023, and placed her with her maternal grandmother. *See id*. at 118, 158, 161. Thereafter, in July 2023, the Cambria County Court of Common Pleas transferred C.D.P.'s dependency case to Westmoreland County, and WCCB also placed him with maternal grandmother. *See id*. at 118, 161.

Between May 2022 and October 2024, the Orphans' Court held regular permanency review hearings. Overall, Mother failed to meaningfully comply with, or make progress toward the completion of, her court-ordered permanency goals. Primarily, Mother steadfastly refused to acknowledge that Father harmed C.D.P. *See* N.T., 10/31/24, at 24-25, 54, 100, 107, 131, 185; N.T., 2/10/25, at 56, 73, 93; N.T., 3/20/25, at 10, 22, 30, 56, 151; N.T., 8/21/25, at 72. Mother also remained in a relationship with Father and lived with him. *See* N.T., 10/31/24, at 55-57.

Mother additionally failed to consistently visit with the Children. Mother's visits were monitored and occurred twice per week for two hours per

visit.[7] N.T., 10/31/24, at 153. From April 2024 to October 2024, Mother attended only 20 of 47 visits offered to her. *See id*. at 153-55; *see also* N.T., 2/10/25, at 6-7. Mother was unsuccessfully discharged from intensive mental health outpatient treatment in December 2024, and non-offender's counseling in February 2025, due to her non-attendance in those programs. *See* N.T., 2/10/25, at 60-61, 96-97.

On June 18, 2024, WCCB filed petitions seeking the involuntary termination of Mother's parental rights to the Children, then two years old and one year old, respectively, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The Orphans' Court appointed the Children's guardian *ad litem* ("GAL") from the dependency proceedings to represent them.[8]

_____

[7] Vijaya Greene ("Ms. Greene"), an employee of Inclusion, an agency which supervised visits between Mother and the Children, explained that a "monitored" visit meant that "[M]other would be in the visit room. We would be close enough to be able to hear what was going on in the visitation room, and we would physically check . . . [at] approximately [every] fifteen minute[] [intervals]." N.T., 10/31/24, at 156-57.

[8] Because the Children's legal interests were incapable of ascertainment due to their being very young and pre-verbal, the court did not appoint separate legal counsel for them. We discern no error. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (stating appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with section 2313(a)); *see also In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of section 2313(a) of the Adoption Act" is satisfied).

The Orphans' Court commenced an evidentiary hearing on October 31, 2024. The hearing continued on February 10, 2025, March 20, 2025, and August 21, 2025, and included the testimony of, *inter alia*, Dr. Rosenblum; Carol Hughes, M.A. ("Ms. Hughes"), who conducted a forensic parenting capacity assessment of Mother; Dr. O'Malley; two employees who supervised Mother's visits with the Children; Ms. Tipton; Kara Worrall ("Ms. Worrall"), Mother's therapist; and Melissa Lofts ("Ms. Lofts"), a WCCB supervisor. Mother attended the hearing but did not testify or offer evidence.

By orders dated and entered September 18, 2025, the Orphans' Court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The court contemporaneously filed opinions explaining its section (a) determinations. On October 20, 2025, Mother timely filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. **See** Pa.R.A.P. 513. The same day, the Orphans' Court filed a statement pursuant to Rule 1925(a) referring this Court to its analysis in the opinions accompanying the termination orders, which did not include a sufficient discussion of the requirements of 23 Pa.C.S.A. § 2511(b).[9]

---

[9] On March 18, 2026, this Court remanded this matter to the Orphans' Court to file a supplemental opinion that adequately addresses 23 Pa.C.S.A. § 2511(b) and relevant case law. **See Order**, 3/18/26. The Orphans' Court complied on April 10, 2026, but did not notify this Court of its supplemental opinion or return the record to this Court, necessitating an additional order
*(Footnote Continued Next Page)*

On appeal, Mother presents the following issues for our review:

1. Whether the [Orphans' Court] erred in finding by clear and convincing evidence that [WCCB] met its burden under 23 Pa.C.S.A. § 2511(a)(2), 23 Pa.C.S.A. § 2511(a)(5), and 23 Pa.C.S.A. §2511(a) (8)?

2. Whether the [Orphans' Court] erred in finding by clear and convincing evidence that [WCCB] met its burden under 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6.

Our standard of review in involuntary termination cases is well-

established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

_____

and additional delay. This Court did not receive the opinion for more than two months and then only upon our active request. We remind the Orphans' Court of the importance of prompt adjudication in matters involving the termination of parental rights and its responsibility to address all the issues raised by the appellant and to provide us with its opinion and the certified record.

 We also note that to the extent the Orphans' Court filed orders purporting to involuntarily terminate Mother's parental rights a second time, the court did not have jurisdiction to do so because, upon remand, this Court retained jurisdiction in this appeal. *See* Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasi[-]judicial order is sought, the trial court or other government unit may no longer proceed further in the matter").

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal quotations and citations omitted).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the eleven enumerated grounds of parental conduct that may warrant termination. *See* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the Orphans' Court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the Orphans' Court's determination as to any one

- 9 -

subsection of section 2511(a), in addition to section 2511(b), in order to affirm termination. **See M.E.**, 283 A.3d at 830 (citing **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

We focus upon 23 Pa.C.S.A. § 2511(a)(2) and (b).[10]  Those sections provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . ..

23 Pa.C.S.A. § 2511(a)(2), (b).

---

[10] Accordingly, we offer no opinion with respect to the Orphans' Court's findings regarding section 2511(a)(5) or (8).  **See In re K.R.**, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing that this Court may proceed to a review of one subsection of section 2511(a) "[w]ithout considering the orphans' court['s] determinations" under any other subsection).

To prove section 2511(a)(2) by clear and convincing evidence, the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)).

If the Orphans' Court concludes adequate grounds for termination exist pursuant to section 2511(a), the court then turns to section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has recognized that "case law indicates that [the parental] bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the section 2511(b) analysis." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Further, Orphans' Courts "must consider whether the child[] [is] in a pre-adoptive home and . . . ha[s] a bond with . . . [the] foster parents." *Id*. at 1106.

The Supreme Court has further directed that a section 2511(b) inquiry must include consideration of the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993); *K.T.*, 296 A.3d at 1109-10. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008)). The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *T.S.M.*, 71 A.3d at 269. A failure to do so could be catastrophic for the child:

> Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

*Id*.

With respect to section 2511(a)(2), Mother contends that the court abused its discretion because she visited the Children and participated in non-offender's counseling. *See* Mother's Brief at 12-13. She asserts those visits went well and her participation in non-offender's counseling allowed her to identify certain factors relative to abuse, permitting her to remedy the conditions that led to removal. *Id*. at 12-13.

The Orphans' Court explained its conclusion noting WCCB established section 2511(a)(2) by clear and convincing evidence because Mother had not remedied those conditions:

Since services started for Mother . . ., [she has not been] able to demonstrate sufficient and consistent corrective action to alleviate concerns of [WCCB]. Mother [] did not complete the services recommended to address [her] individual mental health concerns. [Mother did not attend] visits on a regular basis nor successfully complet[e] parenting instruction. Mother did not successfully complete non-offender's treatment. . . . Mother continues to lack protective capacity on account of her unwillingness to separate from Father. As such, Mother is not a safe option to parent the [C]hildren.

Orphans' Court Opinion, 9/18/25, at 19-20 (unpaginated).

The record fully supports the court's findings. The evidence demonstrates Mother repeatedly, persistently refused to acknowledge Father's abuse of C.D.P. and thus could not provide safety for the Children. Specifically, Dr. Rosenblum testified Mother said she does not believe Father injured C.D.P. and that "she doesn't trust the doctors or anyone who is going to say that [the injuries] w[ere] [Father's] fault." N.T., 10/31/24, at 25. Similarly, Ms. Tipton, who provided Mother non-offender's counseling from April 2023, until approximately July 2024, testified that Mother denied Father abused C.D.P., told her that she was "co-dependent" with Father, and she "would be unable to exist without him." N.T., 2/10/25, at 52-53, 56, 58. A third witness, Carol Hughes, who completed a forensic parenting capacity assessment of Mother in March 2025, testified Mother still refused to acknowledge that Father abused C.D.P. *See* N.T., 3/20/25, at 23, 30.

Ms. Hughes further opined Mother could not ensure the Children's safety due to her inability to, at a minimum, emotionally separate from Father. *See id*. at 30-31, 35. Finally, a fourth witness, WCCB case supervisor, Ms. Lofts, testified Parents live on the same lot, *see id*. at 130, and that

> Mother continues to deny [F]ather's culpability. She is demanding proof of [F]ather's involvement.
>
> She has been provided proof. She heard the . . . testimony and medical findings from the Children's Hospital at the adjudication . . . when we were adjudicating [D.R.P.] regarding the non-accidental trauma to [C.D.P.'s] head, and she . . . refuses to accept that [F]ather poses a risk to the . . . [C]hildren.

*Id.* at 130, 151.

Of additional significance, although Mother completed the initial portion of the non-offender's counseling program, she never responded to Ms. Tipton from August 2024 to February 2025, about completing the program, and was thus unsuccessfully discharged. *See* N.T., 2/10/25, at 59-61.

Mother's mental health represented an additional impediment to her providing for the needs of her two very young children. Dr. Rosenblum opined that Mother's multiple diagnoses, including borderline personality disorder, could significantly impact her parenting due to her unstable emotions and difficulty interacting with others. In addition, Ms. Worrall, Mother's therapist, testified Mother attended only 19 of 56 group sessions and approximately one-half of the 40 individual sessions offered. *See* N.T., 2/10/25, at 87-91. As a result of her non-attendance, Mother was unsuccessfully discharged from intensive outpatient therapy in December 2024, and she did not resume

treatment. *See id*. at 96-97, 101. Overall, the record indicates that Mother failed to make any progress in treatment. *See id.*

Finally, Mother failed to consistently visit the Children, and thus, did not demonstrate that she could appropriately parent the Children regularly. Ms. Greene testified that in the six months beginning April 2024, Mother attended twelve visits and missed eight. *See* N.T., 10/31/24, at 154. Separately, Shelly Weaver ("Ms. Weaver"), another visitation supervisor, testified that during the same time frame, Mother missed twelve of twenty visits she offered. *See* N.T., 2/10/25, at 6-7. Thus, although there was some evidence presented that Mother's visits with the Children were "positive in nature," Mother failed to progress beyond monitored visitation. N.T., 10/31/24, at 153, 156.

We conclude that the record clearly establishes that Mother's repeated and continued incapacity, neglect; her refusal to acknowledge Father's abuse of C.D.P.; and her failure to complete any of her court-ordered services has caused the Children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being since their removals in May 2022 and March 2023, respectively. Further, the evidence shows Mother's incapacity, neglect, and refusal cannot or will not be remedied, because they persisted after more than two years of agency assistance and services. Therefore, we discern no abuse of discretion in the Orphans' Court's

determination involuntary termination of Mother's parental rights was warranted pursuant to section 2511(a)(2).

Mother's second issue asserts the Orphans' Court abused its discretion because a bond exists between her and the Children, which was demonstrated by the mutual affection displayed during visits.[11] *See* Mother's Brief at 18.

In its supplemental opinion, the Orphans' Court concluded that the Children's needs and welfare were best served by involuntarily terminating Mother's parental rights. *See* Supplemental Opinion, 4/10/26, at 22-27 (unpaginated).

The record demonstrates the Children's parental bond is with maternal grandmother. Ms. Lofts testified that if the Children were removed from

---

[11] To the extent Mother refers to the Orphans' Court's failure to order a bonding assessment, we emphasize that "section 2511(b) does not require a formal bonding evaluation." *Z.P.*, 994 A.2d at 1121.

Further, in her arguments pursuant to section 2511(b), Mother argues the Orphans' Court should have refrained from terminating her parental rights because her abilities have allegedly improved since the Children were removed from her care. *See* Mother's brief at 18-19. This aspect of Mother's arguments is not responsive to the legal standards attendant to section 2511(b), but, instead, to section 2511(a)(2). *Compare* 23 Pa.C.S.A. § 2511(a)(2) *with id*. at 2511(b).

Inasmuch as Mother has framed this issue in terms of the Children's needs and welfare, we note that the record does not support her contention. Indeed, the Orphans' Court aptly found, "Ms. Greene and Ms. Weaver recalled Mother needing assistance with parenting from Maternal Grandmother. If the [Children] became injured or ill during a visit, . . . Mother deferred to Maternal Grandmother or the provider." Supplemental Opinion, 4/10/26, at 24 (unpaginated); *see also* N.T., 2/10/25, at 10-11, 31.

maternal grandmother, it would be detrimental to them, emphasized that maternal grandmother is "incredibly proactive" in meeting all of the Children's needs. *Id*. at 161. Specifically, D.R.P. underwent a magnetic resonance imaging ("MRI") to determine if she has cerebral palsy. *See* N.T., 2/10/25, at 203-05.[12] Further, C.D.P. has asthma, severe food allergies, and receives speech therapy due to issues resulting from his brain injury inflicted by Father. *See id*. at 204. Ms. Lofts testified that the Children see maternal grandmother "as a safe base" and go to her for all their needs. *Id*. at 162-63. The Children remained with maternal grandmother, who is a pre-adoptive resource, through the conclusion of the termination hearing. *See id*.

Further, the Orphans' Court harbored significant concerns regarding Mother's ability to "preserve the welfare" of the Children, as follows:

> Numerous providers raised concern over Mother's ability to keep the [Children] safe. At no point did Mother ever recognize the alleged actions of abuse by Father and how said actions would impact the [Children]. . . . Mother continued to entertain the position that the dog could have harmed [C.D.P.] and did not accept the idea that Father could have been the perpetrator.
>
> * * * * *
>
> Almost every provider involved with this case voiced serious safety concerns for the [Children]. Concerns were presented with respect to Mother's ability to keep [C.D.P.] safe and away from Father. Mother voiced a lack of surety to providers that she could keep [C.D.P.] away from Father, despite the pending criminal charges. Ms. Tipton, who provided Mother with non-offender's

---

[12] At the time of the termination hearing, D.R.P. was still undergoing tests to determine a diagnosis. *See* N.T., 3/20/25, at 203-04.

treatment, stated that Mother was deeply connected to Father as they shared a trauma bond. Mother informed Ms. Tipton that she would not attribute [C.D.P.'s] injuries to Father without evidence of the crime. . . .

*Id.* at 26-27 (unpaginated). The Orphans' Court's concerns regarding Mother's ability to protect the Children are well documented in the certified record. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted) ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child. . . .").

Based upon the foregoing, the record supports the Orphans' Court's conclusion that the Children's developmental, physical and emotional needs and welfare were best served by the termination of Mother's parental rights. Therefore, we discern no abuse of discretion pursuant to section 2511(b). Accordingly, we affirm the orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/15/2026

- 18 -